No. 25-3386

# In the United States Court of Appeals for the Ninth Circuit

RENÉ QUIÑONEZ AND MOVEMENT INK LLC,

*Plaintiffs–Appellants,*

v.

UNITED STATES OF AMERICA, ET AL.,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:22-cv-3195-WHO
Hon. William H. Orrick

## APPELLANTS' OPENING BRIEF

Anna M. Barvir
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
(562) 216-4444
abarvir@michellawyers.com

Jaba Tsitsuashvili
Patrick Jaicomo
Bobbi Taylor
Anya Bidwell
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
(703) 682-9320
jtsitsuashvili@ij.org

*Counsel for Plaintiffs–Appellants*

## Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1(a): Plaintiff–Appellant Movement Ink LLC is a private, nongovernmental corporation. It is not a publicly held corporation, it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## Table of Contents

Disclosure Statement ..................................................................................... ii

Table of Authorities ....................................................................................... v

Statement Regarding Oral Argument ........................................................... 1

Statement of Jurisdiction ............................................................................. 1

Provisions of Law ......................................................................................... 1

Statement of Issues ...................................................................................... 2

Statement of the Case .................................................................................. 3

    I.      Introduction ................................................................................ 3

    II.    Factual History ........................................................................... 5

    III.   Legal Background ..................................................................... 14

    IV.   Procedural History.................................................................... 16

Summary of Argument ............................................................................... 18

Standard of Review ..................................................................................... 19

Argument ..................................................................................................... 20

    I.      The district court rendered the Westfall Act unconstitutional as applied to Lee's tortious and unconstitutional seizure of Plaintiffs' property ................................................................................... 21

    II.    The district court wrongly barred Plaintiffs' FTCA trespass claim for Lee's tortious and unconstitutional seizure of their property............ 26

III.    The district court wrongly held that the Westfall Act does not preserve any constitutional-tort claims in Plaintiffs' circumstances ....... 28

    A.    The district court wrongly held that the Westfall Act does not preserve Plaintiffs' Bane Act claims ................................................. 29

    B.    The district court wrongly held that the Westfall Act does not preserve Plaintiffs' state common-law tort claims brought for the violation of their constitutional rights ........................................ 33

    C.    The district court wrongly held that the Westfall Act does not preserve Plaintiffs' *Bivens* claims ...................................................... 36

IV.    The district court wrongly foreclosed Plaintiffs' FTCA claims for the trespassory search of Plaintiffs' property and for the tortious interference with Plaintiffs' economic relations ...................................... 40

    A.    The district court wrongly held that a law-enforcement officer's investigatory physical intrusion of Plaintiffs' property was not a Fourth Amendment search ........................................................... 41

    B.    The district court wrongly held that Mr. Quiñonez cannot competently testify as to the existence and substance of his own business relationships and negotiations ......................................... 47

Conclusion ................................................................................................ 53

Statement of Related Cases .................................................................... 55

Certificate of Compliance ...................................................................... 56

Addendum ................................................................................................ 57

iv

# Table of Authorities

**Cases**

*Ali v. BOP*,
552 U.S. 214 (2008)........................................................................... 27–28

*Barthelemy v. Air Lines Pilots Ass'n*,
897 F.2d 999 (9th Cir. 1990) ...................................................................51

*Bethea v. Reid*,
445 F.2d 1163 (3d Cir. 1971) ................................................................ 37

*Bissonette v. Haig*,
800 F.2d 812 (8th Cir. 1986)..............................................................37–38

*Black Lives Matter D.C. v. Barr*,
2024 WL 3300158 (D.D.C. July 4, 2024)........................................... 30

*Boddie v. Connecticut*,
401 U.S. 371 (1971)............................................................................. 25

*Bostock v. Clayton County*,
590 U.S. 644 (2020)...............................................................................31

*Bounds v. Smith*,
430 U.S. 817 (1977) ........................................................................ 24, 25

*Buchanan v. Barr*,
71 F.4th 1003 (D.C. Cir. 2023) ...................................................*passim*

*Buckaloo v. Johnson*,
14 Cal. 3d 815 (1975)............................................................................51

*Bush v. Lucas*,
462 U.S. 367 (1983) ............................................................................ 40

*Butz v. Economou,*
  438 U.S. 478 (1978) .................................................................... 39

*Byrd v. Lamb,*
  990 F.3d 879 (5th Cir. 2021) ...................................................... 23

*Carlson v. Green,*
  446 U.S. 14 (1980) ................................................................ 37, 38

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .................................................................... 52

*Chong v. United States,*
  112 F.4th 848 (9th Cir. 2024) ..................................................... 44

*Cohen v. ConAgra Brands, Inc.,*
  16 F.4th 1283 (9th Cir. 2021) ..................................................... 19

*ConsumerDirect, Inc v. Pentius, LLC,*
  2024 WL 4744052 (C.D. Cal. Oct. 28, 2024) .............................. 50

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
  543 U.S. 157 (2004) .................................................................... 31

*Cross v. Buschman,*
  2024 WL 3292756 (3d Cir. July 3, 2024) ......................... 23, 30, 35

*Dellums v. Powell,*
  566 F.2d 167 (D.C. Cir. 1977) .................................................... 39

*Desire, LLC v. Manna Textiles, Inc.,*
  986 F.3d 1253 (9th Cir. 2021) ..................................................... 19

*Doe v. CVS Pharmacy, Inc.,*
  982 F.3d 1204 (9th Cir. 2020) .................................................... 46

*Dominguez-Curry v. Nev. Transp. Dept.,*
  424 F.3d 1027 (9th Cir. 2005) ..................................................... 51

*Egbert v. Boule*,
   596 U.S. 482 (2022) ....................................................... 40

*Florida v. Jardines*,
   569 U.S. 1 (2013) ................................................. 44, 46

*Garcia v. Service Employees Intn'l Union*,
   993 F.3d 757 (9th Cir. 2021) ........................................19

*Gibson v. United States*,
   781 F.2d 1334 (9th Cir. 1986) ................................. 39, 40

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ....................................................... 39

*Hernandez v. Mesa*,
   589 U.S. 93 (2020) ....................................................... 36

*Hernandez v. United States*,
   353 F.2d 624 (9th Cir. 1965) ....................... 41, 42, 43, 44, 45

*Hui v. Castaneda*,
   559 U.S. 799 (2010) ....................................................... 30

*Ill. State Bd. of Elections v. Socialist Workers Party*,
   440 U.S. 173 (1979) ....................................................31

*Ex parte Jackson*,
   96 U.S. 727 (1878) ....................................................... 46

*JL Beverage Co. v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) ..................................19, 52

*Johnson v. Avery*,
   393 U.S. 483 (1969) ....................................................... 25

*Midland Nat'l Bank v. N.J. Dep't of Env. Prot.*,
   474 U.S. 494 (1986) ....................................................... 38

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
15 F.4th 885 (9th Cir. 2021) ................................................................19

*Paton v. La Prade*,
524 F.2d 862 (3d Cir. 1975) ........................................................ 37, 39

*Powertech Tech., Inc. v. Tessera, Inc.*,
2014 WL 171830 (N.D. Cal. Jan. 15, 2014) ..................................... 50

*Rivera v. County of Los Angeles*,
745 F.3d 384 (9th Cir. 2014) ........................................................... 30

*Ross v. Meese*,
818 F.2d 1132 (4th Cir. 1987) ......................................................... 37

*Roth v. Foris Ventures, LLC*,
86 F.4th 832 (9th Cir. 2023) .........................................................5, 33

*Royal Canin U.S.A., Inc. v. Wullschleger*,
604 U.S. 22 (2025) ...........................................................................31

*Sandoval v. County of Sonoma*,
912 F.3d 509 (9th Cir. 2018) ........................................................... 33

*Schowengerdt v. Gen. Dynamics Corp.*,
823 F.2d 1328 (9th Cir. 1987) ......................................................... 37

*Silicon Labs Integration, Inc. v. Melman*,
2010 WL 890140 (N.D. Cal. Mar. 8, 2010) ...................................... 50

*State Marine Lines Inc. v. Shultz*,
498 F.2d 1146 (4th Cir. 1974) ......................................................... 37

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) ........................................................... 52

*Tanzin v. Tanvir*,
592 U.S. 43 (2020) ....................................................................*passim*

*United States v. Dixon,*
   984 F.3d 814 (9th Cir. 2020) ................................................. 44, 45

*United States v. England,*
   971 F.2d 419 (9th Cir. 1992) ...................................................... 45

*United States v. Jones,*
   565 U.S. 400 (2012) ............................................................. 44, 45

*United States v. Lee,*
   106 U.S. 196 (1882) .................................................................. 25

*United States v. Ngumezi,*
   980 F.3d 1285 (9th Cir. 2020) .................................................... 45

*United States v. Smith,*
   499 U.S. 160 (1991) ....................................................... 30, 31, 32

*Uzuegbunam v. Preczewski,*
   592 U.S. 279 (2021) .................................................................. 26

*Webster v. Doe,*
   486 U.S. 592 (1988) .................................................................. 24

*Westfall v. Erwin,*
   484 U.S. 292 (1988) .................................................................. 34

*Wilkie v. Robbins,*
   551 U.S. 537 (2007) .................................................................. 34

*Wolff v. McDonnell,*
   418 U.S. 539 (1974) .................................................................. 24

*Yiamouyiannis v. Chem. Abstracts Serv.,*
   521 F.2d 1392 (6th Cir. 1975) ................................................... 39

*Zweibon v. Mitchell,*
   606 F.2d 1172 (D.C. Cir. 1979) .................................................. 37

**Statutes**

28 U.S.C. § 1331 .................................................................................................. 36

28 U.S.C. § 1346 ..................................................................................................15

28 U.S.C. § 2679 ........................................................................................... *passim*

28 U.S.C. § 2680 ..............................................................................................16, 27

Cal. Civil Code § 52.1 .....................................................................................29, 30, 32

**Rules**

Fed. R. Civ. P. 56 ................................................................................................ 52

**Other Authorities**

Akhil Reed Amar,
    *Of Sovereignty and Federalism,*
    96 Yale L.J. 1425 (1987)................................................................................ 23

Akhil Reed Amar,
    *Using State Law to Protect Federal Constitutional Rights: Some Questions and*
    *Answers About Converse-1983,*
    64 U. Colo. L. Rev. 159 (1993) .................................................................... 29

David E. Engdahl,
    *Immunity and Accountability for Positive Governmental Wrongs,*
    44 U. Colo. L. Rev. 1 (1972) ........................................................................ 24

Patrick Jaicomo & Anya Bidwell,
    *Unqualified Immunity and the Betrayal of Butz v. Economou: How the*
    *Supreme Court Quietly Granted Federal Officials Absolute Immunity for*
    *Constitutional Violations,*
    126 Dick. L. Rev. 719 (2022) ........................................................... 15, 24, 39

## Statement Regarding Oral Argument

Appellants respectfully submit that oral argument is warranted. This case presents vital, timely, and foundational issues concerning federal accountability. The district court held that the baseless, speech-suppressing seizure of Plaintiffs' property by a federal official is absolutely immune from *any* cause of action under the modern federal-accountability rubric. It reached that conclusion after Plaintiffs presented every possible cause of action, and after Plaintiffs argued that the nation's original constitutional order presumed and demanded a day in court for such rights-violating federal conduct. Oral argument will help this Court assess those weighty issues, and help assess Plaintiffs' contentions that, in fact, even the modern accountability landscape provides a road to relief.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1346, 1356, 1357, 1367, 2201, 2202, 2674, and 2679. This Court has jurisdiction over the district court's final judgment and all that merges with that judgment under 28 U.S.C. § 1291. The district court entered final judgment disposing of all parties' claims on April 15, 2025. Plaintiffs–Appellants filed a timely notice of appeal on May 22, 2025.

## Provisions of Law

Constitutional and statutory provisions are produced in the Addendum.

1

## Statement of Issues

This four-part Statement of Issues tracks Plaintiffs' four Argument sections.

**1.** The violation of Plaintiffs' rights that underpins this case is a federal official's unjustified, speech-suppressing seizure of Plaintiffs' property. At the founding, that trespass would be actionable via state common-law tort. The district court held that, today, no cause of action exists for that tortious and unconstitutional seizure, be it under the Federal Tort Claims Act (FTCA), the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), or any other federal or state source of law. The first issue is: If the district court correctly held that the unlawful seizure of Plaintiffs' property is absolutely immune from any cause of action under the modern statutory scheme, then is the Westfall Act unconstitutional as applied (because it abrogates Plaintiffs' founding-era cause of action and replaces it with nothing)?

(Issues 2 and 3 ask whether the district court's absolute-immunity holding as to Plaintiffs' seizure claim is wrong, because Plaintiffs do in fact have multiple causes of action for that claim. Holding in Plaintiffs' favor on issue 2, issue 3, or both may obviate the need to address the constitutional question raised by issue 1. Holding in Plaintiffs' favor solely on issue 4, however, does not obviate that question because the claims addressed in issue 4 are factually and legally independent of the seizure claim.)

**2.** Does the FTCA provide a cause of action against the government for the tortious and unconstitutional seizure of Plaintiffs' property?

**3.** Does the Westfall Act's constitutional-torts provision (28 U.S.C. § 2679(b)(2)(A)) provide a cause of action against the offending federal official for the tortious and unconstitutional seizure of Plaintiffs' property?

**4.** Separate and apart from the claims concerning the seizure of Plaintiffs' property addressed in issues 1–3, did the district court wrongly foreclose Plaintiffs' additional FTCA claims for trespassory search and for economic interference?

**Statement of the Case**

## I.    Introduction

Movement Ink is a small screen-printing shop in Oakland. René Quiñonez runs it as a business, but also a labor of love—a chance to work with and support community groups and individuals doing social-justice and community-building initiatives. In the summer of 2020, after many fledgling years, he got his biggest order ever: thousands of cloth masks emblazoned with political protest for the Movement for Black Lives (M4BL). This was everything René wanted Movement Ink to be— part of the movement. He enlisted family, friends, and community members to help fill these massive rush orders, and he barely slept for days. They did it. Thousands of masks printed and shipped, thousands of protesters adorned with messages like "Stop Killing Black People." Talks for future prints ensued.

3

But not all went as planned. René's local postal clerk, Robin Lee—who knew René and the activist nature of his business—diverted four of those packages to the United States Postal Inspection Service (USPIS), causing René and his M4BL customers to receive an alert that their protest apparel had been "seized by law enforcement." Lee seized the packages without giving a single reason, and in defiance of USPIS instructions *not* to divert any packages that did not have a strong odor of marijuana (René's packages had none). The predictable happened: M4BL's National Director and its members panicked and cut ties with Movement Ink and with René—even though M4BL still views Movement Ink as a "values aligned organization."

USPIS then proceeded to keep the packages indefinitely detained (without so much as a call to René or the recipients). When the story made national news, USPIS released them. But then two officers wrote wholly fabricated memos covering up what happened—purporting to pin the seizures on backroom mail clerks who did not know René. Those clerks said unequivocally that they were never even interviewed. The officers perpetuated the lie for years, including in sworn depositions and district court filings.

No one ever faced a shred of accountability for the initial seizure or the lies.

After futile efforts to get answers—including Lee pretending not to know anything and the government's heavily redacted FOIA responses—René sued.

4

## II. Factual History[1]

### *Movement Ink — René's labor of love*

René Quiñonez is a family man, entrepreneur, activist, former youth gang-prevention director, and executive director of a youth outreach and job development nonprofit. All those aspects of his personality find expression in Movement Ink LLC, the small screen-printing business he and his family spent over a decade building into a community presence, known for its brand of activism-inspired business practices and relationships. 4-ER-818.

From its inception, as the company's name indicates, Movement Ink has been publicly allied and involved with social-justice and activism movements, organizations, nonprofits, and individual organizers. René and Movement Ink have spent years cultivating their brand, their image, and their reputation in these spaces, including community involvement and social-media presence. As a result of years of

---

[1] The district court dismissed on the pleadings nearly every claim that is at issue on appeal (except interference with prospective economic relations, which was foreclosed at summary judgment, and which is supported by additional record evidence in part IV, *infra*), so these facts are drawn from Plaintiffs' operative Fourth Amended Complaint. *See* 4-ER-815. Except for the two claims at issue in part IV, the district court made no conclusions as to whether Plaintiffs satisfied the elements of their claims; the court simply held they were not cognizable no matter how well-pleaded. In accordance with this Court's typical practice, the district court can make those substantive adequacy determinations in the first instance on remand. *See Roth v. Foris Ventures, LLC*, 86 F.4th 832, 838 (9th Cir. 2023).

commitment to causes, trust-building, and high-quality screen-printing, René and Movement Ink successfully developed business relationships with activists and nonprofits, who relied on René and Movement Ink for various screen-printing needs for years leading up to and into 2020, regularly ordering products ranging from t-shirts, to hoodies, to onesies. René and Movement Ink methodically built and carved out this niche, making René very proud of what he and his family built. 4-ER-818.

Thanks to the years René and Movement Ink spent promoting and developing social-justice causes and organizations, they were the supplier of choice when Movement For Black Lives (M4BL) organizers around the country began ordering Covid-protective facemasks bearing political messages for the mass protests that broke out following the police killings of George Floyd and Breonna Taylor in 2020. In the first week of June 2020, René, his family, and community members worked around the clock to print, pack, and ship thousands of masks around the country. René could count on two hands the number of hours he slept over the course of several days. The masks that René, Movement Ink, his family, and his community printed for M4BL were emblazoned with core political messages, like "STOP KILLING BLACK PEOPLE" and "DEFUND POLICE." This hard work and dedication were borne of much more than a profit motive; they were borne of a desire

to contribute to the protest movement and express René's and Movement Ink's support for the messages they were printing for M4BL. 4-ER-819.

### *Robin Lee's baseless seizure of René's packages*

On June 3, René took four boxes of the screen-printed masks to the Oakland Main Post Office for mailing to protest organizers in Brooklyn, DC, Minneapolis, and St. Louis. He shipped those boxes from the same postal facility, with the same postal clerk (Robin Lee), and similar packaging, payment, and shipping methods as he had done for years on behalf of Movement Ink. The postal officials at that facility, including Lee, knew René and his business. They were friendly with each other, and René and Lee used to joke about René's last-minute rush shipments and the high prices René paid for next-day deliveries. Lee also knew about the screen-printing and activist nature of René's business because René regularly discussed those things while making his shipments. 4-ER-820.

Lee would have seen that one or more of the boxes had a label that said "masks" or "BLM masks," which was affixed by Movement Ink's supplier. The boxes did not exhibit any of the characteristics that USPS employees are trained to look for to indicate hazardous or dangerous materials. If the boxes did exhibit such characteristics, Lee would not have accepted them for shipment. 4-ER-820.

7

Lee had explicit written instructions from local USPIS team leader Mark Hodges regarding when Lee should and should not divert packages to USPIS for assessment by law enforcement. Those instructions expressly told Lee not to divert any package to USPIS unless it had a strong odor of marijuana. René's boxes did not have any odor of marijuana coming from them, let alone a strong one. But Lee diverted all four of René's boxes—which Lee knew were on behalf of René's screen-printing business—to USPIS anyway. 4-ER-820.

Lee provided not one single reason for his seizure and diversion of the packages, except a post-hoc explanation to Hodges the next day that René shipped "suspicious" packages in the past—even though Lee had never rejected any of René's packages for shipment until these M4BL mask orders. 4-ER-823–824.

Lee knew that: (1) his diversion of the packages would result in their delay (which it did); (2) his diversion of the packages would likely result in a notice to René and his mask customers that the packages had been "Seized by Law Enforcement" (which it did); (3) the packages would likely be detained for weeks and then opened in accordance with USPIS policies (which they would have been, had Lee's diversion of the political masks not made national news); and (4) even if not opened, the packages would likely be searched by USPIS officials by squeezing or other physical intrusion (which they were). 4-ER-821.

8

### *USPIS's indefinite detention of René's packages*

When the packages arrived at USPIS, they were assessed by law-enforcement officers Steven Fajardo and Carlos Ruiz, pursuant to USPIS's package "profile" for seizing, detaining, searching, and opening mail without warrants. To decide whether to detain the packages or return them to the mail-stream, Fajardo and Ruiz visually inspected the packages and their labels, squeezed the packages to determine if they smelled like marijuana or narcotics, and entered the names and addresses into a federal database to determine any associations with known criminal activity—finding none. Fajardo and Ruiz did not call any of the phone numbers listed in the sender or recipient fields of the packages or do any other investigation, such as googling "Movement Ink" (which was clearly identified on every package). As one of their bosses noted the next day, however, Fajardo and Ruiz had plenty of time to take those or other investigative steps. 4-ER-821.

Like Lee, Fajardo and Ruiz should have seen that one or more of the boxes had a label that said "masks" or "BLM masks," which was affixed by Movement Ink's supplier of the blank masks. Seeing all that, confirming that the packages had no suspicious feel or odor, and not bothering to call anyone, Fajardo and Ruiz decided to detain Movement Ink's packages anyway. Pursuant to USPIS policy, that meant

9

the packages would sit on a shelf for several weeks before being opened by USPIS—without any further investigation or a warrant. 4-ER-821.

To justify detaining Movement Ink's packages and letting them languish in detention without any investigation—after confirming that the packages felt and smelled normal—Fajardo and Ruiz gave only the following boilerplate reasons, from a dropdown list of options: "Bulging contents"; "Parcel mailed from a known drug source area"; "Frequently mailed parcels from the same sender/address"; "Parcel destination is a known drug trafficking area"; "Missing sender's name"; "Taped or glued on all seams". 4-ER-822.

No USPIS definition exists as to the meaning of "Bulging contents." Per USPIS, there is not a single city or state in the country that could *not* qualify as "a known drug source area." Every package sent from California qualifies for that descriptor. Per USPIS, simply mailing multiple packages at once—without ever having mailed a single package before—qualifies as "Frequently mailed parcels from the same sender/address." Every shipment of multiple packages to multiple locations qualifies for that descriptor. Per USPIS, there is not a single city or state in the country that could not qualify as a "known drug trafficking area." Every package mailed to Brooklyn, DC, Minneapolis, or St. Louis qualifies for that descriptor. 4-ER-822.

10

Movement Ink's packages were not "Missing sender's name." That information was clearly visible and legible on the packages. Meanwhile, "Taped . . . on all seams" is how USPS itself publicly advises customers to prepare their boxes for shipping. And it is how USPIS officials themselves repackage boxes before returning them to the mail-stream after opening. Complying with USPS's public guidance (as well as the common sense of securely taping one's packages) qualifies for that descriptor. 4-ER-822.

No other reasons were given, except a post-hoc justification of messy or crossed-out handwriting. No USPIS definition exists as to the meaning of those descriptors, which apply to the packages of anyone who has imperfect penmanship or makes a mistake. 4-ER-823.

Fajardo was fired for his role in detaining Movement Ink's packages. Inexplicably, Ruiz—who behaved no differently—faced no consequences. 4-ER-823.

### *USPIS's yearslong coverup of what happened*

The result of Robin Lee's decision to divert what he knew were Movement Ink's commercial mask shipments was that instead of receiving what they ordered, Movement Ink's M4BL customers received alerts that their apparel protesting law enforcement had been "Seized by Law Enforcement." 4-ER-823.

11

The story made national news, resulting in Mark Hodges—Fajardo's and Ruiz's team leader—being admonished by his supervisors before dawn the next day to immediately return the packages to the mail-stream, find out what happened, and report back to some of the highest-ranking USPS and USPIS officials. 4-ER-823.

Jeff Agster (one of Hodges's supervisors) saw the reasons Fajardo and Ruiz wrote for detaining the packages and, without seeking any further investigation or details, ordered that the packages immediately be returned to the mail-stream. Hodges succeeded in returning all four detained packages to the mail-stream that day. 4-ER-823.

Hodges went to the Oakland Main Post Office—where Lee had diverted the four packages in violation of Hodges's directive not to divert any package to USPIS unless it had a strong odor of marijuana. There, Lee admitted to diverting René's packages. 4-ER-823.

That afternoon, Hodges and his team (including Ruiz and Aaron Doo) learned that Movement Ink had shipped three other boxes on June 4 from another post office, and they made sure those three were not detained. Those June 4 boxes were not diverted to USPIS. They were essentially indistinguishable from the four June 3 boxes that Lee did divert: all were in similar or identical brown boxes; all were densely packed; at least one in each batch could be described as somewhat "bulging"; all

12

were sent via express overnight shipment; all were labeled with "Movement Ink" or "Movement" as the sender; all were going from Oakland to other major American cities; all likely had a label from The Apparel Source indicating that they contained "masks" or "BLM masks"; and all were heavily taped. But the June 4 ones did not go through Lee. 4-ER-824.

Even though Hodges knew René and Movement Ink shipped the four diverted June 3 packages, he—like Fajardo and Ruiz before him—decided to never call René or Movement Ink, even though their phone number was clearly listed on every single package, and even though Agster indicated that was the number that needed to be called. 4-ER-824.

Even though Hodges already knew what happened to the four diverted June 3 packages (Lee admitted to diverting them, as Hodges memorialized), he ordered USPIS inspector Aaron Doo to write a new investigative memorandum nearly two weeks later. By this time, both Hodges and Doo knew the nature of Movement Ink's business and its activism, knew that Movement Ink's business relationships with M4BL were implicated, knew that Congresswoman Barbara Lee had submitted a congressional inquiry on René's behalf, and knew that there was a litigation risk arising from the packages' treatment. 4-ER-825.

13

Suddenly, per Hodges's instructions, Doo wrote a whole different story about what happened: Doo wrote that it was not Robin Lee who diverted Movement Ink's packages, but rather Tito Cuevas, who never interacted with customers (unlike Lee, who already admitted to knowing René). Doo wrote that Cuevas explained at length his reasons for diverting the packages (which just happened to align with Fajardo's and Ruiz's reasons). And Doo wrote that Johnny Leong (who worked near Cuevas, both frantically sorting express mail packages) corroborated that it was Cuevas who diverted Movement Ink's packages. 4-ER-825.

But Doo made that all up. Leong and Cuevas both testified under oath that no one from USPIS ever even interviewed them about the packages or the events at issue. And Cuevas testified under oath that he did not divert Movement Ink's June 3 packages to USPIS. When government counsel asked Cuevas, "Do you believe that the postal inspector who wrote this Memorandum of Interview is lying?", Cuevas answered unequivocally: "Yes." 4-ER-825.

The lies that Hodges and Doo told were perpetuated for years, including in their sworn depositions in this case, and in several filings before the district court.

### III.   Legal Background

Some table-setting may help orient the Court as to the various causes of action Plaintiffs invoked in this case, all of which the district court held the government and

14

Lee are absolutely immune from with respect to Lee's tortious, speech-suppressing seizure of Plaintiffs' packages—a conclusion that, if true, renders the modern federal accountability scheme unconstitutional as applied (*see* part I, *infra*).

At the nation's founding, Lee's seizure of Plaintiffs' property would be actionable against him under state tort law. *Tanzin v. Tanvir*, 592 U.S. 43, 49 (2020). That "suit[] would proceed in three steps." *Buchanan v. Barr*, 71 F.4th 1003, 1014 (D.C. Cir. 2023) (Walker, J., concurring). Plaintiffs "would file a state-law trespass suit against" Lee; Lee "would argue that his actions were authorized by a federal statute, a warrant, or a command from a superior officer"; and "[t]o defeat that defense, [Plaintiffs] would argue that any purported federal authorization was unconstitutional." *Id.*[2] That is how constitutional violations—like Lee's baseless, speech-suppressing seizure of Plaintiffs' packages—were redressed.

In 1946, Congress *supplemented* that cause of action against the offending federal official with a new cause of action against the federal government itself, under the FTCA. 28 U.S.C. §§ 1346, 2679. "But the FTCA's remedies are limited," including "substantive limits on claims that would otherwise be available under state

---

[2] Congress might, after a finding of liability, indemnify Lee; but the liability would be his. Patrick Jaicomo & Anya Bidwell, *Unqualified Immunity and the Betrayal of Butz v. Economou: How the Supreme Court Quietly Granted Federal Officials Absolute Immunity for Constitutional Violations*, 126 Dick. L. Rev. 719, 723–33 (2022).

law." *Buchanan*, 71 F.4th at 1013 (Walker, J., concurring). For example, the government does not assume liability for certain discretionary functions, for certain kinds of postal-related torts, for certain detention-related torts, and for certain intentional torts. *See* 28 U.S.C. § 2680. In this case, the district court held that those substantive exceptions foreclose any FTCA claim arising from Lee's seizure.

For decades, the gaps left by the FTCA's limited sovereign-immunity waiver would continue to be filled by the state-law cause of action discussed above that existed against Lee at the founding. The 1988 Westfall Act, however, "generally prohibits tort victims from bringing state tort suits against federal officers, forcing victims to instead pursue the limited remedies in the FTCA." *Buchanan*, 71 F.4th at 1016 (Walker, J., concurring) (citing 28 U.S.C. § 2679(b)(1)). "But the Westfall Act does not preclude 'a civil action [against Lee] brought for a violation of the Constitution of the United States.'" *Id.* (quoting 28 U.S.C. § 2679(b)(2)(A)). What that constitutional-torts provision entails is an open question. *Id.*; *see* part III, *infra*.

## IV.   Procedural History

**1.** Here, Plaintiffs brought their claims concerning Lee's baseless seizure of their property under all the causes of action discussed above. *See* 4-ER-817 n.1, 831 n.2. First, against the government under the FTCA. *See* part II, *infra*. Second, against Lee under the various iterations of the Westfall Act's constitutional-torts provision

16

(§ 2679(b)(2)(A)) that Judge Walker explains should be available. *See* part III, *infra*. And third, under the founding-era common-law tort default, if both of the first two are now statutorily foreclosed. *See* part I, *infra* (arguing that those founding-era claims are revived if the FTCA and Westfall Act causes of action are foreclosed).

The district court held that the government and Lee are absolutely immune from all those causes of action for Lee's baseless, speech-suppressing seizure of Plaintiffs' property, 1-ER-16, 43, and that the modern statutory scheme's elimination of any accountability for that completed harm poses no constitutional problem, 1-ER-88. Plaintiffs argue in part II, *infra*, that the FTCA is, in fact, available to remedy Lee's seizure. And Plaintiffs argue in part III, *infra*, that the constitutional-torts provision is too. Otherwise, the modern scheme is unconstitutional as applied—for eliminating founding-era remedies and replacing them with nothing. *See* part I, *infra*.

**2.** Plaintiffs also brought claims under the same causes of action for Lee's economic interference (which requires facts beyond just an unconstitutional seizure), and for the USPIS law-enforcement Defendants' conduct: Ruiz and Fajardo's unconstitutionally baseless indefinite detention of Plaintiffs' packages after their unconstitutional search of the packages; and Hodges and Doo's fabrication of what happened, in interference with Plaintiffs' economic prospects and First Amendment rights. *See* 4-ER-817 n.1, 831 n.2, 831–833. In part IV, *infra*, Plaintiffs explain that

17

certain FTCA claims—separate and apart from Lee's initial seizure—remain viable, and that the district court wrongly foreclosed them. Moreover, if the Court agrees with Plaintiffs' argument in part III, *infra*, that the Westfall Act's constitutional-torts provision provides a cause of action, then those claims must be revived not only against Lee, but also Ruiz, Fajardo, Hodges, and Doo.

## Summary of Argument

The violation of Plaintiffs' rights that underpins this case is Robin Lee's unjustified, speech-suppressing seizure of Plaintiffs' property. At the founding, that trespass would be actionable via state common-law tort. The district court held that, today, no cause of action exists for that tortious and unconstitutional seizure, be it under the FTCA, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), or any other federal or state source of law. If the district court correctly held that the unlawful seizure of Plaintiffs' property is absolutely immune from any cause of action under the modern statutory scheme, then the Westfall Act is unconstitutional as applied—because it abrogates Plaintiffs' founding-era cause of action and replaces it with nothing.

But the Court need not reach that conclusion. The FTCA provides an available cause of action for Lee's seizure. So does the Westfall Act's constitutional-torts provision, 28 U.S.C. § 2679(b)(2)(A).

18

Separate and apart from that seizure claim, the FTCA also provides an available cause of action for USPIS's search of Plaintiffs' packages, and for Plaintiffs' claim of interference with prospective economic relations.

**Standard of Review**

The issues presented are pure questions of law reviewed de novo. *See Garcia v. Serv. Emps. Int'l Union*, 993 F.3d 757, 762 (9th Cir. 2021) (subject matter jurisdiction; motion to dismiss); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021) (failure to state a claim); *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021) (grant of summary judgment; statutory interpretation); *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1287 (9th Cir. 2021) (futility of amending complaint). On reviewing the district court's grant of dismissal, the Court "accept[s] the factual allegations of the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Mudpie, Inc.*, 15 F.4th at 889. On reviewing the district court's grant of summary judgment, the Court "determine[s] whether there are any genuine issues of material fact" by "[v]iewing the evidence in the light most favorable to the nonmoving party." *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1104 (9th Cir. 2016).

**Argument**

Plaintiffs' argument proceeds in four parts (tracking the Statement of Issues).

**Part I:** The district court held that, under the circumstances of this case, no cause of action exists for the tortious and unconstitutional seizure of Plaintiffs' property by a federal official (postal clerk Lee), be it under the FTCA, the Westfall Act's constitutional-torts provision, or any other source of law. If the district court correctly held that Lee's unlawful seizure of Plaintiffs' property is absolutely immune from suit under the modern statutory scheme, then that scheme is unconstitutional as applied. If so, Plaintiffs must have a cause of action for that completed violation of their rights via the founding-era default of a state common-law tort claim.

**Parts II and III:** Lee's tortious and unconstitutional seizure of Plaintiffs' property is not, in fact, absolutely immune from suit under the modern statutory scheme. The FTCA (against the government) and the Westfall Act (against Lee) provide available causes of action. Holding in Plaintiffs' favor on at least one of these arguments may obviate the need to address the constitutional issue raised in part I.

**Part IV:** Separately, Plaintiffs' FTCA trespassory-search and economic-interference claims are also viable. The district court wrongly held otherwise. Holding for Plaintiffs solely as to the viability of these claims, however, does not

20

obviate part I's constitutional question as to absolute immunity for Plaintiffs' seizure claim, because these claims are factually and legally independent of the seizure claim.

**I.     The district court rendered the Westfall Act unconstitutional as applied to Lee's tortious and unconstitutional seizure of Plaintiffs' property.**

The violation of Plaintiffs' rights that underpins this case is the tortious and unconstitutional seizure of Plaintiffs' property by postal clerk Defendant Robin Lee—who, knowing Plaintiffs and the speech-based nature of their business, seized and diverted their property without justification. The district court held that the government and Lee are absolutely immune from any cause of action for that completed harm. If the district court is right that Congress has created a statutory scheme under which that completed violation of Plaintiffs' rights is absolutely immune from any cause of action, then that modern statutory scheme is unconstitutional as applied—because it eliminates a founding-era feature of our constitutional design (a state common-law tort claim) and replaces it with nothing. If so, the solution is to revive the state common-law cause of action that Plaintiffs would have had in such circumstances at the founding and well into the 20th century.

**1.** As the complaint explains, Lee unjustifiably seized Plaintiffs' property, to interfere with their speech. 4-ER-820–821, 827. That conduct amounts to a completed violation of Plaintiffs' common-law rights (trespass to chattels) and

21

constitutional rights (First and Fourth Amendments). So Plaintiffs brought those trespass and constitutional claims concerning Lee's seizure of their property under each cause of action detailed above: FTCA claims against the government, Westfall Act constitutional-tort claims against the seizing official, and founding-era tort claims against the seizing official. *See* Procedural History, *supra*.

The district court, however, rejected as a matter of law *every* cause of action for Lee's completed tort—not on the substance or plausibility of the trespass and constitutional violations alleged (the district court did not reach those substantive questions), but as a matter of absolute immunity. No FTCA cause of action available. 1-ER-16. No Westfall Act constitutional-torts cause of action available. 1-ER-43. And no problem with the Westfall Act eliminating every potential cause of action and replacing it with nothing. 1-ER-88.

**2.** Parts II and III below explain why Plaintiffs do in fact have available causes of action under the FTCA and the Westfall Act concerning Lee's trespass. But if Plaintiffs are wrong, then the Westfall Act is unconstitutional as applied—because, in the district court's understanding, the Act eliminated the cause of action Plaintiffs historically had (sounding in state common-law tort) and replaced it with nothing. *See Buchanan*, 71 F.4th at 1015 n.4 (Walker, J., concurring) (collecting authorities for the proposition that "prohibiting all damages actions against federal officers might

22

be a constitutional problem today"); *Byrd v. Lamb*, 990 F.3d 879, 883–84 & n.12 (5th Cir. 2021) (Willett, J., specially concurring) (same).

That elimination of federal accountability is unconstitutional because our founding constitutional order "presupposed 'a general backdrop of private law' causes of action to vindicate 'primary rights of personal property and bodily liberty.'" *Buchanan*, 71 F.4th at 1015 (Walker, J., concurring) (quoting Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1507 (1987)); *see also Cross v. Buschman*, 2024 WL 3292756, at *2 n.1 (3d Cir. July 3, 2024) (Matey, J., concurring) ("To the framers, . . . the Constitution presupposed a going legal system, with ample remedial mechanisms, in which constitutional guarantees would be implemented.") (citation omitted). Put simply: The Constitution, as originally understood, presupposes the right to a cause of action to remedy federal officials' property or liberty violations, effectuated at least by state common-law tort suits. *Tanzin*, 592 U.S. at 49 ("These common-law causes of action remained available through the 19th century and into the 20th."); *Buchanan*, 71 F.4th at 1014–15 (Walker, J., concurring) (detailing the history and how the claims worked).

Given that backdrop—a constitutionally entrenched common-law cause of action for federal officials' rights violations—Congress cannot eliminate such claims and replace them with nothing. The "ratification debates suggest that the Framers

thought state tort suits would be an important check against federal misconduct."
*Buchanan*, 71 F.4th at 1014 (Walker, J., concurring). Likewise, the founding-era Supreme Court regarded "effective judicial redress for positive governmental wrongs" "as paramount and essential to American constitutional government." David E. Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 U. Colo. L. Rev. 1, 27 (1972); *see* Jaicomo & Bidwell, 126 Dick. L. Rev. at 723–29 (discussing illustrative founding-era cases ensuring federal accountability). In short, "the Framers likely expected our newly guaranteed [constitutional] rights to be secured by old common-law actions." *Buchanan*, 71 F.4th at 1015 (Walker, J., concurring). So a modern-day scheme that leaves an individual harmed at the hands of a federal official without "any judicial forum for a colorable constitutional claim" raises "serious constitutional question[s]." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citation omitted).

Indeed, such a scheme violates due process. "The right of access to the courts . . . is founded in the Due Process Clause[,] and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974). "[C]ivil rights actions," in particular, "are of 'fundamental importance . . . in our constitutional scheme' because they directly protect our most valued rights." *Bounds*

*v. Smith*, 430 U.S. 817, 827 (1977) (quoting *Johnson v. Avery*, 393 U.S. 483, 485 (1969)). That judicial guardianship of rights is by design: "American society . . . bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, not on custom or the will of strategically placed individuals, but on the common-law model. It is to courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly process of dispute settlement." *Boddie v. Connecticut*, 401 U.S. 371, 375 (1971). So denying "full access to that process raises grave problems for its legitimacy." *Id.* at 376.

Our history is replete with judicial decisions protecting "the fundamental constitutional right of access to the courts." *Bounds*, 430 U.S. at 821–25 (collecting cases). An alternative design—where "courts cannot give remedy when the citizen has been deprived of his property by force"—would flout our national character and "sanction[] a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well regulated liberty and the protection of personal rights." *United States v. Lee*, 106 U.S. 196, 220–21 (1882).

**3.** Despite that constitutional design—and our history of honoring it against federal officials' rights violations—the district court held that the Westfall Act eliminates Plaintiffs' fundamental right of judicial access for the completed invasion

25

of their legal rights by Lee's tortious and unconstitutional seizure of their property. If the district court is right, then the Westfall Act is unconstitutional as applied. The solution is to revive Plaintiffs' founding-era right to bring state common-law tort claims against Lee—the default cause of action that the district court held the Westfall Act eliminated without replacing.[3]

The Court, however, need not go there. Plaintiffs do, in fact, have multiple causes of action for Lee's unlawful property seizure: against the government under the FTCA (part II, *infra*), and against Lee under the Westfall Act (part III, *infra*).

## II. The district court wrongly barred Plaintiffs' FTCA trespass claim for Lee's tortious and unconstitutional seizure of their property.

The FTCA is the simplest way to avoid the district court's absolute-immunity holding as to Lee's unlawful seizure of Plaintiffs' property. The district court held that the FTCA's detention-of-goods exception entirely forecloses Plaintiffs' seizure-based trespass claim. But the court erred. That exception only applies to claims

---

[3] The government is likely to argue that the Court need not reach this issue because the district court held that *other* violations might be actionable (though ultimately foreclosed those as a matter of law too). *See* part IV, *infra*. But Plaintiffs' argument is that Lee's initial seizure of their property was a *completed* tort and constitutional violation, so the happenstance of whether or not *more* violations also occurred cannot dictate the constitutionality of eliminating all causes of action for Lee's initial, completed trespass—the quintessential founding-era tort for safeguarding property rights. *Cf. Uzuegbunam v. Preczewski*, 592 U.S. 279, 285–89 (2021) (at common law, every completed violation of a legal right was actionable, including trespass).

arising from property detention "by any officer of customs or excise or any other law enforcement officer"—which Lee, the seizing official, is not. 28 U.S.C. § 2680(c).

Plaintiffs argued below that no exception forecloses their FTCA trespass claim arising from the seizure of their property. 6-ER-1351. The district court rightly agreed that neither the postal exception nor the discretionary-function exception applies to unconstitutional conduct. 1-ER-55, 68. But the court nevertheless only allowed Plaintiffs' trespass claim "to proceed to the extent that the plaintiffs alleged that the parcels were 'searched in violation of the Fourth Amendment.'" 1-ER-26. The detention-of-goods exception foreclosed Plaintiffs' seizure claim. 1-ER-70.

Foreclosing Plaintiffs' FTCA trespass claim for Lee's initial seizure of their property requires reversal because the detention-of-goods exception only applies to claims arising from the conduct of "any officer of customs or excise or any other law enforcement officer." 28 U.S.C. § 2680(c). Postal clerk Lee is not an officer of customs or excise, and he is not a law enforcement officer. So his conduct is categorically beyond the reach of the FTCA's detention-of-goods exception. This alone requires remand for the district court to adjudicate Plaintiffs' FTCA trespass claim based on Lee's seizure of their property.[4]

---

[4] Plaintiffs preserved and continue to preserve for Supreme Court reconsideration whether the detention-of-goods exception should apply to USPIS law-enforcement officers (i.e., the other offending officials in this case). *See Ali v.*

27

### III. The district court wrongly held that the Westfall Act does not preserve any constitutional-tort claims in Plaintiffs' circumstances.

Plaintiffs have additional causes of action available too—under the Westfall Act's constitutional-torts provision, which preserves "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). That provides a cause of action for at least one of the following: (1) a state statutory claim "if a constitutional violation is part of the [statutory] cause of action"; (2) a state common-law claim "if its *purpose* is to remedy a constitutional violation"; and (3) certain *Bivens* claims. *Buchanan*, 71 F.4th at 1016 (Walker, J., concurring). Plaintiffs argued below that all three theories apply to Lee's unconstitutional seizure of Plaintiffs' property.[5]

The district court held, as a blanket matter of law, that none of Plaintiffs' three constitutional-torts theories are cognizable. 1-ER-44. That was legal error. First, by authorizing "a civil action against an employee of the Government . . . which is

---

*BOP*, 552 U.S. 214, 228–43 (2008) (Kennedy, J., dissenting); *id.* at 243–47 (Breyer, J., dissenting). But that reconsideration is not necessary with respect to Lee, whose job description the exception does not reach even under *Ali*'s currently broad construction.

[5] And more. The constitutional-torts provision also applies to the USPIS law-enforcement Defendants' unconstitutional detentions and searches of Plaintiffs' property and all of the individual Defendants' unconstitutional interference with Plaintiffs' contract and economic rights. This Court only needs to reverse the district court's holding that the provision is toothless as a wholesale matter of law; the provision's precise applications can be sorted on remand.

brought for a violation of the Constitution of the United States," the Westfall Act authorizes Plaintiffs' claims under California's Bane Act (Cal. Civil Code § 52.1), a state statutory cause of action for federal constitutional violations. Second, the Westfall Act also authorizes state common-law torts brought for the purpose of remedying the violation of Plaintiffs' constitutional rights. And third, the Westfall Act authorizes Plaintiffs' *Bivens* claims at least under the Fourth Amendment.

### A. The district court wrongly held that the Westfall Act does not preserve Plaintiffs' Bane Act claims.

**1.** The Westfall Act's constitutional-torts provision preserves "a civil action against an employee of the government . . . which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Under that plainly worded authorization, "nothing would stop a state from creating a new cause of action allowing plaintiffs to directly allege federal constitutional violations" against federal officials. *Buchanan*, 71 F.4th at 1016 (Walker, J., concurring) (citing Akhil Reed Amar, *Using State Law to Protect Federal Constitutional Rights: Some Questions and Answers About Converse-1983*, 64 U. Colo. L. Rev. 159, 160 (1993)). And California's Bane Act creates precisely such a state cause of action. *See* Cal. Civil Code § 52.1(b)–(c) ("[A] person or persons, whether or not acting under color of law," who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or

29

individuals of rights secured by the Constitution . . . of the United States" can be sued by the victim.).

The "inquiry [on this issue] begins and ends with the text." *Hui v. Castaneda*, 559 U.S. 799, 805 (2010). The constitutional-torts provision authorizes civil actions brought for federal officials' violations of the Constitution, and the Bane Act is a civil action brought for violations of the Constitution. *See Rivera v. County of Los Angeles*, 745 F.3d 384, 393 (9th Cir. 2014) ("[T]he Bane Act . . . is a cause of action for violations of constitutional . . . rights."). So the district court's dismissal of Plaintiffs' Bane Act claims must be reversed.

**2.** The district court erred by instead reading the Westfall Act's constitutional-torts provision "as a good-for-*Bivens*-only rule"; that limited construction "is in tension with the statutory text and context," as several judges recognize. *Buchanan*, 71 F.4th at 1017 (Walker, J., concurring).[6] The district court did not assess that statutory text or context, instead holding that it had to limit the provision to *Bivens* claims under *United States v. Smith*, which referred to the provision as "a *Bivens*

---

[6] *See Cross*, 2024 WL 3292756, at *5 n.12 (Matey, J., concurring) (quoting Judge Walker); *Black Lives Matter D.C. v. Barr*, 2024 WL 3300158, at *9 (D.D.C. July 4, 2024) (the provision "must require a plaintiff to plead a constitutional violation either as a *Bivens* claim *or as part of his cause of action*") (emphasis added).

action"—in a case that did not present and did not turn on whether the provision also means more. *See* 499 U.S. 160, 166–67 (1991).

*Smith*'s drive-by statement "does not control the outcome here" because whether the provision preserves only *Bivens* claims or also preserves state statutory constitutional claims "was outside the issue being decided—or more colloquially put, beside the point." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 42 (2025). *Smith*'s description is a quintessential example of an issue "neither brought to the attention of the court nor ruled upon," *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004), so "no resolution of [the issue] may be inferred." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979).

The question, then, is whether relying on *Smith* to limit the constitutional-torts provision to *Bivens* claims "withstands analysis." *Royal Canin*, 604 U.S. at 43. "And it does not," *id.*, for the simple reason that "Congress could have taken a more parsimonious approach" to the provision's language, but decided to speak in the general, broad terms of *a civil action. Bostock v. Clayton County*, 590 U.S. 644, 656–57 (2020). Indeed, the Supreme Court recently shorthanded the provision's reach in the same broad terms in which Congress wrote it. *Tanzin*, 592 U.S. at 49 (the provision "left open claims for constitutional violations and certain statutory

31

violations"). There is no reason that *Tanzin*'s more recent articulation of the provision's scope should warrant less weight than *Smith*'s, let alone give way to it.

Moreover, reading the provision to abrogate all state-law causes of action for constitutional violations by federal officials would be especially peculiar given the "legal 'backdrop against which Congress enacted'" the provision: an unbroken history of state "common-law causes of action [that] remained available through the 19th century and into the 20th" against federal officials. *Tanzin*, 592 U.S. at 48–49 (citation omitted). "So we might expect exceptionally clear language if Congress had wanted to abrogate that regime. Instead, we find statutory text tailored to *preserve* it," via § 2679(b)(2)(A). *Buchanan*, 71 F.4th at 1017 (Walker, J., concurring).

**3.** Because § 2679(b)(2)(A) preserves causes of action for federal officials' constitutional violations, and because the Bane Act is a cause of action for federal officials' constitutional violations, Plaintiffs' Bane Act claims must proceed. To hold otherwise would be to "create a new policy-based presumption against damages against individual officials," which the courts "are not at liberty to do," especially against the historical pedigree of such actions against federal officials. *Tanzin*, 592 U.S. at 49, 52.[7]

---

[7] Because the district court constricted the constitutional-torts provision's scope to *Bivens* claims, it did not comment on the viability of Plaintiffs' Bane Act claims. This Court may wish to follow its usual practice of leaving such untouched

32

**B.** **The district court wrongly held that the Westfall Act does not preserve Plaintiffs' state common-law tort claims brought for the violation of their constitutional rights.**

In addition to preserving state statutory causes of action for federal officials' constitutional violations, the text and context of the constitutional-torts provision dictate that it also preserves state common-law tort claims that are "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

First, the text: "On a broad reading of the exception, a suit might count as 'brought for a violation of the Constitution' if its *purpose* is to remedy a constitutional violation. For instance, a state trespass suit could proceed if its goal was to remedy an unconstitutional search. That interpretation arguably tracks the ordinary meaning of the phrase 'brought for.' Courts have long used it to describe the goal of a suit, not the cause of action." *Buchanan*, 71 F.4th at 1016 (Walker, J., concurring) (citations omitted). And that interpretation applies to Plaintiffs' trespass claims (and their

---

issues for remand. *See Roth*, 86 F.4th at 838. Or the Court can simply hold that Plaintiffs' Bane Act claims are adequately pleaded under Circuit precedent, which recognizes that a government official's intentional or reckless violation of Fourth Amendment property rights satisfies the Bane Act's elements—precisely what Plaintiffs have pleaded with respect to at least postal clerk Lee's baseless seizure of their property in order to interfere with their speech. *See Sandoval v. County of Sonoma*, 912 F.3d 509, 519 (9th Cir. 2018). The *Sandoval* standard is also met with respect to USPIS law-enforcement officer Ruiz's search of Plaintiffs' property. *See* part IV, *infra*.

33

other tort claims), which are *brought for* the violation of their First and Fourth Amendment rights.

Second, the context: Congress passed the Westfall Act's general channeling of state tort claims into the FTCA in response to a successful *negligence* claim against individual federal officials—*not* a constitutional claim. *See Westfall v. Erwin*, 484 U.S. 292 (1988). In the same breath, Congress made sure to *preserve* constitutional claims against the very same officials (via the constitutional-torts provision). Given the "long tradition of using state tort actions to police constitutional violations"—i.e., the founding-era state-tort default that formed the remedial backdrop for 200 years— the most natural understanding of what Congress preserved via the constitutional-torts provision is a version of the historical default: common-law tort claims that, unlike the claim in *Westfall*, go beyond mere negligence and instead cross the line into unconstitutionality. *Buchanan*, 71 F.4th at 1017 (Walker, J., concurring). The Supreme Court has already said as much in *Wilkie v. Robbins*, explaining that the plaintiff there did not need a *Bivens* remedy against the federal defendants' unconstitutional conduct because he "had a civil remedy in damages for trespass." 551 U.S. 537, 551 (2007). "For that statement to be correct, the Westfall Act must not preclude state torts brought for constitutional violations." *Buchanan*, 71 F.4th at 1016 n.5 (Walker, J., concurring).

34

In short: "As Judge Walker has explained, reading § 2679(b)(2)(A) to permit state tort actions for federal constitutional injuries 'finds support in the text of the statute, accords with Founding-era principles of officer accountability, and closes a remedial gap—ensuring relief for those injured by federal officers' unconstitutional conduct.'" *Cross*, 2024 WL 3292756, at *5 n.12 (Matey, J., concurring) (quoting *Buchanan*, 71 F.4th at 1017 (Walker, J., concurring)).

So Plaintiffs' state common-law trespass claims against Lee for his unconstitutional seizure of their property must proceed under the Westfall Act's constitutional-torts provision.[8] To hold otherwise—against the provision's textual, legal, and historical backdrop, without a clear congressional statement abrogating that backdrop—would be to "create a new policy-based presumption against damages against individual officials," which the courts "are not at liberty to do." *Tanzin*, 592 U.S. at 52; *id.* at 49 (recognizing the historical pedigree of damages actions against federal officials).

---

[8] So should: (1) Defendant Lee's unconstitutional interference with Plaintiffs' contracts and prospective economic relations; (2) the USPIS law-enforcement Defendants' unconstitutional trespasses of Plaintiffs' property; and (3) the USPIS law-enforcement Defendants' unconstitutional interference with Plaintiffs' contracts and prospective economic relations.

### C. The district court wrongly held that the Westfall Act does not preserve Plaintiffs' *Bivens* claims.

Finally, the district court also erred in its *Bivens*-only analysis of Plaintiffs' Westfall Act claims. The constitutional-torts "provision simply left *Bivens* where it found it" in 1988. *Hernandez v. Mesa*, 589 U.S. 93, 111 n.9 (2020) (citing 28 U.S.C. § 2679(b)(2)(A)). And by 1988, Congress knew that this Court and its sister circuits considered the availability of Fourth Amendment *Bivens* claims settled, and that the judiciary routinely recognized the availability of those claims in a broad range of circumstances—including cases concerning federal officials' seizures of personal property, as here. Accordingly, via § 2679(b)(2)(A), Congress has preserved at least Plaintiffs' Fourth Amendment claims against Lee.[9] The availability of First Amendment claims was, admittedly, less settled, but likely would have been available under Plaintiffs' circumstances.[10]

**1.** When Congress passed the Westfall Act in 1988, the view among the courts of appeals had long been: "The right to bring an action in the federal courts for

---

[9] And against Ruiz and Fajardo, for their unconstitutional search of Plaintiffs' packages, *see* part IV, *infra*, and their baseless decision to leave Plaintiffs' packages indefinitely detained without a modicum of investigation even after their searches turned up no trace of anything unlawful about the packages.

[10] Plaintiffs preserved and continue to preserve for Supreme Court reconsideration whether, divorced from the *Bivens* regime, (1) § 2679(b)(2)(A) is best understood as Congress's codification of constitutional tort claims full stop and/or (2) whether 28 U.S.C. § 1331 (the federal-question statute) suffices for such claims.

36

damages by a plaintiff who asserts a violation of his fourth amendment rights by persons acting under color of federal law is now *settled*." *Paton v. La Prade*, 524 F.2d 862, 869 (3d Cir. 1975) (emphasis added). As the D.C. Circuit put it: "The principle announced in *Bivens* . . . is that monetary damages are an entirely appropriate remedy for Fourth Amendment violations"—full stop. *Zweibon v. Mitchell*, 606 F.2d 1172, 1179 (D.C. Cir. 1979). Even after the Supreme Court introduced the special-factors inquiry, that Court—and this Court in 1987—understood Fourth Amendment claims to be presumptively available unless proactively defeated "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson v. Green*, 446 U.S. 14, 18–19 (1980); *Schowengerdt v. Gen. Dynamics Corp.*, 823 F.2d 1328, 1333 (9th Cir. 1987) (echoing that demanding special-factors standard).

It is no wonder, then, that Fourth Amendment property-rights claims routinely went ahead—with effectively no handwringing—in the courts of appeals in the years leading up to Congress's passage of the constitutional-torts provision. *E.g.*, *Schowengerdt*, 823 F.2d at 1332–39; *Paton*, 524 F.2d at 869; *Zweibon*, 606 F.2d at 1175; *Bethea v. Reid*, 445 F.2d 1163 (3d Cir. 1971); *State Marine Lines Inc. v. Shultz*, 498 F.2d 1146 (4th Cir. 1974); *Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987); *Bissonette v. Haig*,

37

800 F.2d 812 (8th Cir. 1986) (en banc). And that list is substantially under-inclusive because it is limited to (1) courts of appeals decisions (2) *concerning property-rights violations*, as here.

Against that backdrop, Congress also knew that the "normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midland Nat'l Bank v. N.J. Dep't of Env. Prot.*, 474 U.S. 494, 501 (1986). So if Congress intended to change the federal courts' interpretation of *Bivens* as presumptively providing a cause of action for federal officials' Fourth Amendment violations, it would have said so. Instead, Congress passed a provision that speaks *even more broadly*, preserving "a civil action against an employee of the government . . . which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). In short, as Congress saw it, Plaintiffs' Fourth Amendment *Bivens* claims would not even present a new context in 1988. To the extent they did, no special factors would foreclose them because "Congress has [not] provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson*, 446 U.S. at 18–19. "We cannot manufacture a new presumption now and retroactively impose it on a Congress that acted [37] years

38

ago." *Tanzin*, 592 U.S. at 52. Plaintiffs' Fourth Amendment claims must proceed under § 2679(b)(2)(A).

**2.** The cognizability of Plaintiffs' First Amendment claims (also arising from Lee's speech-suppressing seizure of Plaintiffs' packages) is, admittedly, less sure. But the state of the law in 1988 suggests that Congress would have expected those claims to proceed too. By 1986, this Court had joined its sister circuits "in holding that" "*Bivens* claims based on the First Amendment" are "properly cognizable." *Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986) (collecting cases); *see, e.g.*, *Dellums v. Powell*, 566 F.2d 167, 195 (D.C. Cir. 1977); *Paton*, 524 F.2d at 875; *Yiamouyiannis v. Chem. Abstracts Serv.*, 521 F.2d 1392, 1393 (6th Cir. 1975). Indeed, the general availability of First Amendment claims against federal officials was so accepted that the Supreme Court felt compelled to tamp down their effects by inventing qualified immunity. *See Butz v. Economou*, 438 U.S. 478 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); Jaicomo & Bidwell, 126 Dick. L. Rev. at 744–47. Accordingly, as discussed above with respect to Fourth Amendment claims, because Congress knew the state of the law when it enacted § 2679(b)(2)(A) and did not textually limit the reach of *Gibson* or any other First Amendment *Bivens* cases, Plaintiffs' First Amendment claims are also cognizable under § 2679(b)(2)(A).

39

The Supreme Court recently held that "Congress, not the courts, is better suited to authorize [a First Amendment] damages remedy." *Egbert v. Boule*, 596 U.S. 482, 499 (2022). Plaintiffs submit that Congress did—via § 2679(b)(2)(A) and the prevailing *Bivens* backdrop against which Congress enacted it.[11] At the very least, Congress did so with respect to Fourth Amendment claims, the presumptive availability of which was ubiquitous when Congress passed § 2679(b)(2)(A).

IV.   **The district court wrongly foreclosed Plaintiffs' FTCA claims for the trespassory search of Plaintiffs' property and for the tortious interference with Plaintiffs' economic relations.**

In addition to erroneously erecting an absolute immunity for Defendant Lee's tortious and unconstitutional seizure of Plaintiffs' property, the district court also made legal errors concerning the viability of two additional, independent legal claims (both of which are legally and factually distinct from Lee's unlawful seizure, and from each other). Each error requires reversal.

First, the district court wrongly held that a law-enforcement officer's physical intrusion of Plaintiffs' property for information-gathering did not constitute a Fourth

---

[11] *Bush v. Lucas*, 462 U.S. 367 (1983), in which the Supreme Court declined to recognize a First Amendment *Bivens* claim in the government employment context, should not alter the result because the circuit court cases cited above postdated—and so had to be consistent with—*Bush*'s limited holding in that particular context of government employment, as contrasted to the claims brought by ordinary persons exercising their speech rights in *Gibson*, the other cited cases, and this case.

Amendment search, thereby foreclosing Plaintiffs' FTCA trespass claim arising from the conduct of Defendant Ruiz.

Second, the district court erroneously held that Mr. Quiñonez could not competently testify about his own business relationships and negotiations, thereby foreclosing Plaintiffs' FTCA claim for interference with prospective economic relations arising from the conduct of Defendants Lee, Hodges, and Doo.

### A. The district court wrongly held that a law-enforcement officer's investigatory physical intrusion of Plaintiffs' property was not a Fourth Amendment search.

The district court only allowed Plaintiffs' trespass claim "to proceed to the extent that the plaintiffs alleged that the parcels were 'searched in violation of the Fourth Amendment.'" 1-ER-26. On that theory, the district court nevertheless held on the pleadings that, as a matter of law, USPIS officer Ruiz's information-gathering squeeze-and-sniff of Plaintiffs' property was not a search. In doing so, the court wrongly held that a law-enforcement officer's information-gathering physical intrusion is not a Fourth Amendment search in Plaintiffs' property-bailment setting, 1-ER-32, even though this Court already held that the *exact same conduct* was a search in an analogous property-bailment setting. *See Hernandez v. United States*, 353 F.2d 624, 626 (9th Cir. 1965). That materially indistinguishable Circuit law must control. Subsequent Supreme Court and Circuit cases make that conclusion inescapable.

41

**1.** USPIS law-enforcement officer Ruiz explained that he squeezed and sniffed Plaintiffs' packages in order to determine the inner contents' physical characteristics and whether the escaping air would smell like marijuana or other drugs. 1-ER-31, 2-ER-360–363, 4-ER-849. The district court held, as a matter of law, that that physically intrusive investigation was not a Fourth Amendment search—even though it is precisely the conduct this Court held was a search in *Hernandez.*

There, an officer "went to the storage area in the airport terminal building where appellant's bags had been sent to await loading." 353 F.2d at 626. He "lifted them to feel their weight. He pressed their sides together, forcing air from the interior. Smelling the escaping air, he detected odor of marihuana and called the police department's narcotics division." *Id.* This Court held that the squeeze-and-sniff "manipulation of appellant's bags . . . constituted a 'search' within the meaning of the Fourth Amendment." *Id.* "The contents of the bags were not exposed to Sergeant Butler's sight or smell before the bags were squeezed. He detected the odor of marihuana as the result of an 'exploratory investigation,' an 'invasion or quest,' a 'prying into hidden places for that which was concealed'—conduct which has been repeatedly said to characterize a 'search.'" *Id.* (citations omitted).

So too here. Ruiz simultaneously squeezed and sniffed Plaintiffs' packages in order to determine the contents' physical characteristics and whether the escaping

air would smell like marijuana or other drugs. That is exactly the kind of physical "manipulation" for an "exploratory investigation," "invasion or quest," or "prying into hidden places for that which was concealed" that this Court had no trouble concluding was a Fourth Amendment search in *Hernandez*. The same exact conduct must be deemed a search here too. The only difference is that Ruiz's search revealed nothing unlawful, because there was nothing unlawful to reveal.

**2.** The district court reasoned that the same exact conduct that was a search in *Hernandez* was not a search here because: (1) "that case involved personal luggage, not mail"; (2) "[i]ndividuals have a heightened property interest in personal luggage," as distinct from the interest they retain in deposited mail; and (3) the "expectation of privacy from exploratory surface touching is much greater in an item that is within the owner's immediate physical control than in an item that someone entrusts to an unknown number of third parties for delivery two states away." 1-ER-32–34.

To start, the district court's reasoning rested on a false premise. In *Hernandez*, like here, the item was not in the owner's physical control and, like here, had indeed been entrusted to an unknown number of third parties for delivery many states away (checked luggage going from Los Angeles to New York). 353 F.2d at 626 ("Sergeant Butler went to the storage area in the airport terminal building where appellant's bags

43

had been sent to await loading. . . . Sergeant Butler then located appellant upstairs in a public bar in the terminal building and arrested him."). So the district court's physical-possession-versus-bailment theory does not get this case out from under *Hernandez*'s control.

More fundamentally, the district court failed to credit the distinction between an expectation-of-privacy analysis (the *Katz* test) and a physical-intrusion analysis (the *Jones* test), each of which *independently* suffices to hold that a search occurred. *Chong v. United States*, 112 F.4th 848, 855–56 (9th Cir. 2024). Faced with an information-gathering physical intrusion, courts "need not decide whether the officers' investigation . . . violated [Plaintiffs'] expectation of privacy under *Katz*. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on [Plaintiffs'] property to gather evidence is enough to establish that a search occurred." *Florida v. Jardines*, 569 U.S. 1, 11 (2013).

"The same principles apply here," as Plaintiffs argued, yet the district court conducted only a *Katz* analysis. *United States v. Dixon*, 984 F.3d 814, 820 (9th Cir. 2020). Applying the simpler physical-intrusion analysis: Ruiz only learned whether Plaintiffs' packages felt or smelled like drugs (they did not) by physically squeezing them to gather that law-enforcement evidence. That keeps this case easy, just like

44

*Hernandez* was. More recently, this Court has applied the physical-intrusion theory to find a search based on "insertion of [a] key into [a] minivan's lock." *Dixon*, 984 F.3d at 820. Same with "the opening of [a] car door and leaning into the car." *United States v. Ngumezi*, 980 F.3d 1285, 1290 (9th Cir. 2020). Those conclusions are "in accord with" other circuits' physical-intrusion holdings. *Dixon*, 984 F.3d at 820–21 (approvingly citing cases finding searches for inserting a key into a door lock, chalking car tires, pushing a finger against a tire to learn what was inside, and collecting DNA from a parked car door). There is no reason this case comes out differently.

**3.** To try to distinguish *Hernandez*, the government may point to this Court's assertion that a "person who deposits an item in the United States mail retains far less of an interest in the mailed item than does a person who checks his luggage for transport with a common carrier." *United States v. England*, 971 F.2d 419, 420 (9th Cir. 1992). But that is not enough. First, the same diminished-privacy argument was tried and rejected in this Court's recent physical-intrusion car-search cases just discussed. *E.g.*, *Dixon*, 984 F.3d at 819–20. Second, the virtue of the physical-intrusion test is that the Court need not assess societal psychological assumptions—the Court simply looks at what an officer did (information-gathering physical intrusion). *United States v. Jones*, 565 U.S. 400, 406, 410 (2012). To the extent generalized societal expectations may factor into the physical-intrusion test, the

government bears the burden of demonstrating that "[a] license may be implied from the habits of the country" for law-enforcement officers to physically squeeze and manipulate their mailed packages for purposes of evidence-gathering (as distinct from postal workers' routine handling for delivery). *Jardines*, 569 U.S. at 8. Plaintiffs are aware of no such societal license, and the government has made no such argument.[12] To the contrary, the Supreme Court has long recognized that the postal system must function "consistently with rights reserved to the people"—namely, the protections of the Fourth Amendment against intrusive law-enforcement tactics. *Ex parte Jackson*, 96 U.S. 727, 732 (1878).

**4.** Simply put, the government searched Plaintiffs' packages by conducting an information-gathering physical intrusion. The government has, unsurprisingly, "not argue[d] that any exception to the warrant requirement applies." 1-ER-55. So the search was unconstitutional. With the district court's legal error cleared up, this Court can render judgment in Plaintiffs' favor on this issue—as to which Plaintiffs moved for summary judgment, and as to which the sole material facts (investigatory squeeze-and-sniffs, no warrant) are undisputed.

---

[12] So it is waived, and cannot be asserted for the first time on appeal. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1213 (9th Cir. 2020).

**B.**     **The district court wrongly held that Mr. Quiñonez cannot competently testify as to the existence and substance of his own business relationships and negotiations.**

The district court erroneously granted the government's motion for summary judgment as to Plaintiffs' claims for interference with prospective economic relations—by improperly resolving a *direct dispute of fact* regarding *the* material issue: Did Movement Ink reasonably expect any additional screen-printing orders from M4BL in 2020? Mr. Quiñonez swore that he was in active discussions for such orders with the same two individuals who placed the mask orders, and with whom he had worked before (M4BL's then-National Director and M4BL's graphic-design consultant). And he swore that those discussions abruptly stopped when law-enforcement seized M4BL's mask orders. And he swore that M4BL's graphic designer told him the seizure *was the reason*. To be sure, testimony from M4BL's entity designee suggested that no more orders—or at least no more massive orders— were immediately forthcoming. But that is a quintessential fact dispute demanding trial. The district court erred in holding otherwise—especially because Mr. Quiñonez's testimony was the only one based on personal knowledge of the most crucial facts (i.e., contemporaneous discussions regarding future orders).

**1.** The government moved for summary judgment as to Plaintiffs' FTCA claims for interference with prospective economic relations. Plaintiffs did not. The

district court granted the government's motion, holding that there was no genuine dispute of material fact as to two elements of the interference tort: (1) Plaintiffs' probability of economic benefit from even a single additional screen-printing order by M4BL (of any size) and (2) actual disruption of that relationship by the government's seizure of M4BL's mask orders. 1-ER-19–22. The district court reached that legal conclusion against Mr. Quiñonez even though he spoke directly and unambiguously to both of the relevant issues—based on his personal knowledge—in a sworn declaration:

> **8.** These particular screen-printing orders were placed by the Movement for Black Lives (M4BL) for distribution to its members across the country. They carried messages like "Defund Police" and "Stop Killing Black People."
>
> **9.** The four boxes were part of a huge masks order by M4BL, totaling invoices in the tens of thousands of dollars.
>
> **10.** Karissa Lewis, who I knew and had worked with in the past, placed the mask orders for M4BL. We did not have a written contract for the orders, just invoices upon completion.
>
> **11.** Lewis connected me with Fresco Steez to design and carry out the mask orders for M4BL. Fresco Steez and I worked together to create and complete the graphic designs for the mask orders.
>
> **12.** Instead of delivery notifications, Movement Ink and M4BL received alerts that four of the mask packages had been "Seized by Law Enforcement."
>
> . . .

48

**15.     Before the Government's interference with the mask orders, I had discussions with Karissa Lewis, Fresco Steez, and other M4BL affiliates about expanding the scope of Movement Ink's work for M4BL to include various types of apparel (from hoodies to onesies) going forward.**

**16.     The discussions with Fresco Steez were particularly pronounced, with the expectation on both sides that Movement Ink's success with the mask orders would lead to more national M4BL work for Movement Ink.**

**17.     But Lewis and Fresco Steez abruptly canceled those conversations about future collaboration right after the Government interfered with the mask orders. They essentially cut off communication with me altogether.**

**18.     In explaining to me why that was happening, Fresco Steez pointed directly and solely to the Government interference at issue in this case and the resulting concerns about law enforcement disruption of M4BL's mission.**

**19.     Those lost opportunities for Movement Ink never returned.**

3-ER-541–542 (emphasis added).

In short, Mr. Quiñonez testified that he was in active talks with M4BL's then-National Director (Karissa Lewis) and graphic-design consultant (Fresco Steez) for Movement Ink to do more screen-printing work for M4BL. And he testified that those negotiations ended abruptly because the government seized and detained

M4BL's mask orders. That is direct, firsthand testimony detailing the very facts that courts regularly find sufficient to satisfy the interference tort's probability prong (i.e., the material legal issue).[13]

To be sure, the district court pointed to testimony by M4BL that the court felt called into question just how certain future orders were. *See* 1-ER-22 (M4BL's entity designee testifying that there were no "additional" or "future plans to place orders with Movement Ink," and there was "no reason" for that).[14] But that *direct dispute*—

---

[13] *E.g.*, *ConsumerDirect, Inc. v. Pentius, LLC*, 2024 WL 4744052, at *4 (C.D. Cal. Oct. 28, 2024) ("This evidence surpasses mere speculation about unknown or unidentified business partners or clients."; upholding jury verdict as to this element of the tort even where one of the parties said there was "no 'current relationship'" because additional evidence and context could establish the requisite probability of benefit); *Silicon Labs Integration, Inc. v. Melman*, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010) ("specific references to potential customers with which it had previous sales relationships" and was "engaged in business discussions" was sufficient to satisfy the probability prong); *Powertech Tech., Inc. v. Tessera, Inc.*, 2014 WL 171830, at *11 (N.D. Cal. Jan. 15, 2014) ("'business discussions' with a prospective customer" that "[c]ourts have recognized . . . can form grounds for an interference claim" (collecting cases)).

[14] The other two parts of M4BL's testimony the district court relied on as part of the court's improper weighing of the evidence do not help the government. First, the district court relied on M4BL testimony disavowing plans for indefinitely ongoing orders or for thousands of orders. But the tort is concerned with the probability of a realistic future economic benefit, not the probability of riches. Second—and in that same vein—the district court misread Fresco Steez's lack of "authority to enter into an agreement to name Movement Ink LLC the national and consistent screen-printing partner of" M4BL as, instead: "Steez *had no authority* to make future contracts on behalf of M4BL." 1-ER-22. That is not only inaccurate, but wrong. 9-ER-2022 (**Q:** "But I guess if you had to take a stab at who it would have been that had those relationships and initiated those relationships with Movement Ink, who

50

between Mr. Quiñonez, who was personally involved in the relevant business discussions in 2020, versus M4BL's 2024 entity designee, who was not—is not a reason to grant summary judgment. It is the quintessential reason to deny it. "[I]t is axiomatic that disputes about material facts and credibility determinations must be resolved at trial, not on summary judgment." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005). Especially when the underlying issue— "[w]hether the relationship is of sufficient depth to support the tort"—is itself best suited for resolution at trial. *Buckaloo v. Johnson*, 14 Cal. 3d 815, 830 n.7 (1975).

**2.** To avoid the obvious problems posed by the district court's weighing of testimonies and drawing of credibility determinations at summary judgment, the court recast the facts as: "plaintiffs have offered no evidence to support their position." 1-ER-22. That was based on blackletter legal error twice over.

First, the court held that Mr. Quiñonez's testimony is not based on personal knowledge. 1-ER-21. But it is. His testimony is "evidence of the circumstances of the negotiation and the intent of the parties," which demonstrates "personal knowledge and competence to testify" on those key matters. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990).

---

would it have been?" **A.** "My best guess would be someone from either our communications team on staff or our graphic design consultant, which was Fresco.").

Second, the court discounted the content of Mr. Quiñonez's discussions with Fresco Steez as hearsay the court could not consider. 1-ER-21. That was well-established legal error. Even assuming that Mr. Quiñonez's testimony contains hearsay, "the nonmoving party" need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose [his] own witnesses" (e.g., Karissa Lewis and Fresco Steez). *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). Everything in Mr. Quiñonez's sworn declaration can be provided by testimony at trial, by him and the other participants in the discussions he recounted.

**3.** In short, Mr. Quiñonez's declaration suffices "to require a jury or judge to resolve the parties' differing versions of the truth at trial," particularly accounting for the obligation to "view the evidence in the light most favorable to the nonmoving party" and "assume the truth of [that] evidence" at this stage. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Especially when paired with the surrounding circumstances detailed by M4BL—which paint the

picture of a happy customer, working with a values-aligned vendor, in immediate need of more screen-printing work, but who cut ties with that vendor when their National Director and other members became vocally concerned about the federal government's seizure of their protest apparel.[15]

## Conclusion

The Court should reverse and remand.

---

[15] M4BL testified that it strives to work with vendors that, like Movement Ink, are small, community-based, minority-owned, and values-aligned. M4BL testified that Movement Ink was and continues to be a "values aligned organization." 9-ER-2020. M4BL testified that it was happy with Movement Ink's price, speed, quality, and ability to produce large orders going forward. 9-ER-2026–2027. M4BL testified that no one took issue with the Movement Ink mask orders being placed or the invoices (tens of thousands of dollars) being paid. 9-ER-2024–2025. M4BL testified that it ordered more screen-printed apparel that summer and that fall, including shirts, sweatshirts, jackets, "all kinds of things that year." 9-ER-2022. M4BL testified that then-National Director Karissa Lewis—who placed the Movement Ink mask orders—"was worried, and you know, kind of shocked that the masks had been stopped or had been seized." 9-ER-2025. M4BL testified that "[t]here were members who were concerned about the masks being taken -- being seized, and a few of those members were concerned if that meant M4BL would be facing more scrutiny." 9-ER-2027. M4BL testified that among the "members who were concerned about what this meant for M4BL and the way M4BL could have been scrutinized" was M4BL's entity designee and current Co-Executive Director. 9-ER-2028.

Dated: October 15, 2025                    Respectfully submitted,

Anna M. Barvir                                   s/ Jaba Tsitsuashvili
MICHEL & ASSOCIATES, P.C.                  Jaba Tsitsuashvili
180 E. Ocean Blvd., Suite 200              Patrick Jaicomo
Long Beach, CA 90802                       Bobbi Taylor
(562) 216-4444                            Anya Bidwell
abarvir@michellawyers.com                  INSTITUTE FOR JUSTICE
                                          901 N. Glebe Rd., Ste. 900
                                          Arlington, VA 22203
                                          (703) 682-9320
                                          jtsitsuashvili@ij.org

*Counsel for Plaintiffs–Appellants*

54

## Statement of Related Cases

Plaintiffs–Appellants are not aware of any related cases.

October 15, 2025

s/Jaba Tsitsuashvili
Jaba Tsitsuashvili
*Counsel for Plaintiffs–Appellants*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-3386

I am the attorney or self-represented party.

**This brief contains** 12,226 **words,** including 12,226 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jaba Tsitsuashvili **Date** October 15, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# ADDENDUM

# Constitutional and statutory provisions

# ADDENDUM TABLE OF CONTENTS

**Page**

U.S. Const. amend. I ........................................................................................ 59

U.S. Const. amend. IV ..................................................................................... 60

28 U.S.C.A. § 2671 ...........................................................................................61

28 U.S.C. § 2679 .............................................................................................. 62

28 U.S.C.A. § 2680 .......................................................................................... 65

28 U.S.C.A. § 1346 .......................................................................................... 68

Cal. Civil Code § 52.1...................................................................................... 70

Case: 25-3386, 10/15/2025, DktEntry: 11.1, Page 69 of 82

Amendment I. Establishment of Religion; Free Exercise of..., USCA CONST Amend. I

59

United States Code Annotated
    Constitution of the United States
        Annotated
            Amendment I. Religion; Speech and the Press; Assembly; Petition

U.S.C.A. Const. Amend. I

Amendment I. Establishment of Religion; Free Exercise of Religion; Freedom
of Speech and the Press; Peaceful Assembly; Petition for Redress of Grievances

Currentness

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const Amend. I--Establishment clause; Free Exercise clause>

<USCA Const Amend. I--Free Speech clause; Free Press clause>

<USCA Const Amend. I--Assembly clause; Petition clause>

U.S.C.A. Const. Amend. I, USCA CONST Amend. I
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

59

Case: 25-3386, 10/15/2025, DktEntry: 11.1, Page 70 of 82

Amendment IV. Searches and Seizures; Warrants, USCA CONST Amend. IV-Search...

60

United States Code Annotated
   Constitution of the United States
      Annotated
         Amendment IV. Searches and Seizures; Warrants

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants

Amendment IV. Searches and Seizures; Warrants

Currentness

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for this amendment.>

U.S.C.A. Const. Amend. IV-Search and Seizure; Warrants, USCA CONST Amend. IV-Search and Seizure; Warrants
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

60

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 171. Tort Claims Procedure (Refs & Annos)

28 U.S.C.A. § 2671

§ 2671. Definitions

Currentness

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

"Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States or a member of the National Guard as defined in section 101(3) of title 32, means acting in line of duty.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 982; May 24, 1949, c. 139, § 124, 63 Stat. 106; Pub.L. 89-506, § 8, July 18, 1966, 80 Stat. 307; Pub.L. 97-124, § 1, Dec. 29, 1981, 95 Stat. 1666; Pub.L. 100-694, § 3, Nov. 18, 1988, 102 Stat. 4564; Pub.L. 106-398, § 1 [Div. A, Title VI, § 665(b)], Oct. 30, 2000, 114 Stat. 1654, 1654A-169; Pub.L. 106-518, Title IV, § 401, Nov. 13, 2000, 114 Stat. 2421.)

28 U.S.C.A. § 2671, 28 USCA § 2671
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

End of Document　　　　　© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part VI. Particular Proceedings
         Chapter 171. Tort Claims Procedure (Refs & Annos)

28 U.S.C.A. § 2679

§ 2679. Exclusiveness of remedy

Currentness

**(a)** The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

**(b)(1)** The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

**(2)** Paragraph (1) does not extend or apply to a civil action against an employee of the Government--

   **(A)** which is brought for a violation of the Constitution of the United States, or

   **(B)** which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.

**(c)** The Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any such damage or injury. The employee against whom such civil action or proceeding is brought shall deliver within such time after date of service or knowledge of service as determined by the Attorney General, all process served upon him or an attested true copy thereof to his immediate superior or to whomever was designated by the head of his department to receive such papers and such person shall promptly furnish copies of the pleadings and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the head of his employing Federal agency.

**(d)(1)** Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

**62**

**(2)** Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.

**(3)** In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment. Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. A copy of the petition shall be served upon the United States in accordance with the provisions of Rule 4(d)(4) [1] of the Federal Rules of Civil Procedure. In the event the petition is filed in a civil action or proceeding pending in a State court, the action or proceeding may be removed without bond by the Attorney General to the district court of the United States for the district and division embracing the place in which it is pending. If, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment, the action or proceeding shall be remanded to the State court.

**(4)** Upon certification, any action or proceeding subject to paragraph (1), (2), or (3) shall proceed in the same manner as any action against the United States filed pursuant to section 1346(b) of this title and shall be subject to the limitations and exceptions applicable to those actions.

**(5)** Whenever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to section 2675(a) of this title, such a claim shall be deemed to be timely presented under section 2401(b) of this title if--

**(A)** the claim would have been timely had it been filed on the date the underlying civil action was commenced, and

**(B)** the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action.

**(e)** The Attorney General may compromise or settle any claim asserted in such civil action or proceeding in the manner provided in section 2677, and with the same effect.

### CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 984; Pub.L. 87-258, § 1, Sept. 21, 1961, 75 Stat. 539; Pub.L. 89-506, § 5(a), July 18, 1966, 80 Stat. 307; Pub.L. 100-694, §§ 5, 6, Nov. 18, 1988, 102 Stat. 4564.)

63

**64**

---

**Footnotes**

1      So in original. Probably should be "Rule (4)(i) of the Federal Rules of Civil Procedure".

28 U.S.C.A. § 2679, 28 USCA § 2679
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**64**

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part VI. Particular Proceedings
      Chapter 171. Tort Claims Procedure (Refs & Annos)

28 U.S.C.A. § 2680

§ 2680. Exceptions

Currentness

The provisions of this chapter and section 1346(b) of this title shall not apply to--

**(a)** Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

**(b)** Any claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter.

**(c)** Any claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer, except that the provisions of this chapter and section 1346(b) of this title apply to any claim based on injury or loss of goods, merchandise, or other property, while in the possession of any officer of customs or excise or any other law enforcement officer, if--

  **(1)** the property was seized for the purpose of forfeiture under any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense;

  **(2)** the interest of the claimant was not forfeited;

  **(3)** the interest of the claimant was not remitted or mitigated (if the property was subject to forfeiture); and

  **(4)** the claimant was not convicted of a crime for which the interest of the claimant in the property was subject to forfeiture under a Federal criminal forfeiture law.. [1]

**(d)** Any claim for which a remedy is provided by chapter 309 or 311 of title 46 relating to claims or suits in admiralty against the United States.

**(e)** Any claim arising out of an act or omission of any employee of the Government in administering the provisions of sections 1-31 of Title 50, Appendix.

**65**

**(f)** Any claim for damages caused by the imposition or establishment of a quarantine by the United States.

[**(g)** Repealed. Sept. 26, 1950, c. 1049, § 13(5), 64 Stat. 1043.]

**(h)** Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

**(i)** Any claim for damages caused by the fiscal operations of the Treasury or by the regulation of the monetary system.

**(j)** Any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.

**(k)** Any claim arising in a foreign country.

**(l)** Any claim arising from the activities of the Tennessee Valley Authority.

**(m)** Any claim arising from the activities of the Panama Canal Company.

**(n)** Any claim arising from the activities of a Federal land bank, a Federal intermediate credit bank, or a bank for cooperatives.

## CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 984; July 16, 1949, c. 340, 63 Stat. 444; Sept. 26, 1950, c. 1049, §§ 2(a)(2), 13(5), 64 Stat. 1038, 1043; Pub.L. 86-168, Title II, § 202(b), Aug. 18, 1959, 73 Stat. 389; Pub.L. 93-253, § 2, Mar. 16, 1974, 88 Stat. 50; Pub.L. 106-185, § 3(a), Apr. 25, 2000, 114 Stat. 211; Pub.L. 109-304, § 17(f)(4), Oct. 6, 2006, 120 Stat. 1708.)

## Footnotes

1      So in original. Second period probably should not appear.

28 U.S.C.A. § 2680, 28 USCA § 2680
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**66**

67

**End of Document**                                                                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

67

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1346

§ 1346. United States as defendant

Currentness

**(a)** The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

**(1)** Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

**(2)** Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

**(b)(1)** Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

**(2)** No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18).

**(c)** The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff commencing an action under this section.

**(d)** The district courts shall not have jurisdiction under this section of any civil action or claim for a pension.

**68**

**(e)** The district courts shall have original jurisdiction of any civil action against the United States provided in section 6226, 6228(a), 7426, or 7428 (in the case of the United States district court for the District of Columbia) or section 7429 of the Internal Revenue Code of 1986.

**(f)** The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States.

**(g)** Subject to the provisions of chapter 179, the district courts of the United States shall have exclusive jurisdiction over any civil action commenced under section 453(2) of title 3, by a covered employee under chapter 5 of such title.

#### CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 933; Apr. 25, 1949, c. 92, § 2(a), 63 Stat. 62; May 24, 1949, c. 139, § 80(a), (b), 63 Stat. 101; Oct. 31, 1951, c. 655, § 50(b), 65 Stat. 727; July 30, 1954, c. 648, § 1, 68 Stat. 589; Pub.L. 85-508, § 12(e), July 7, 1958, 72 Stat. 348; Pub.L. 88-519, Aug. 30, 1964, 78 Stat. 699; Pub.L. 89-719, Title II, § 202(a), Nov. 2, 1966, 80 Stat. 1148; Pub.L. 91-350, § 1(a), July 23, 1970, 84 Stat. 449; Pub.L. 92-562, § 1, Oct. 25, 1972, 86 Stat. 1176; Pub.L. 94-455, Title XII, § 1204(c)(1), Title XIII, § 1306(b)(7), Oct. 4, 1976, 90 Stat. 1697, 1719; Pub.L. 95-563, § 14(a), Nov. 1, 1978, 92 Stat. 2389; Pub.L. 97-164, Title I, § 129, Apr. 2, 1982, 96 Stat. 39; Pub.L. 97-248, Title IV, § 402(c)(17), Sept. 3, 1982, 96 Stat. 669; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 102-572, Title IX, § 902(b)(1), Oct. 29, 1992, 106 Stat. 4516; Pub.L. 104-134, Title I, § 101[(a)][Title VIII, § 806], Apr. 26, 1996, 110 Stat. 1321, 1321-75; renumbered Title I, Pub.L. 104-140, § 1(a), May 2, 1996, 110 Stat. 1327; amended Pub.L. 104-331, § 3(b)(1), Oct. 26, 1996, 110 Stat. 4069; Pub.L. 111-350, § 5(g)(6), Jan. 4, 2011, 124 Stat. 3848; Pub.L. 113-4, Title XI, § 1101(b), Mar. 7, 2013, 127 Stat. 134.)

28 U.S.C.A. § 1346, 28 USCA § 1346
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**69**

West's Annotated California Codes
    Civil Code (Refs & Annos)
        Division 1. Persons (Refs & Annos)
            Part 2. Personal Rights (Refs & Annos)

West's Ann.Cal.Civ.Code § 52.1

§ 52.1. Tom Bane Civil Rights Act

Currentness

(a) This section shall be known, and may be cited, as the Tom Bane Civil Rights Act.

(b) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured. An action brought by the Attorney General, any district attorney, or any city attorney may also seek a civil penalty of twenty-five thousand dollars ($25,000). If this civil penalty is requested, it shall be assessed individually against each person who is determined to have violated this section and the penalty shall be awarded to each individual whose rights under this section are determined to have been violated.

(c) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (b), may institute and prosecute in their own name and on their own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct as described in subdivision (b).

(d) An action brought pursuant to subdivision (b) or (c) may be filed either in the superior court for the county in which the conduct complained of occurred or in the superior court for the county in which a person whose conduct complained of resides or has their place of business. An action brought by the Attorney General pursuant to subdivision (b) also may be filed in the superior court for any county wherein the Attorney General has an office, and in that case, the jurisdiction of the court shall extend throughout the state.

(e) If a court issues a temporary restraining order or a preliminary or permanent injunction in an action brought pursuant to subdivision (b) or (c), ordering a defendant to refrain from conduct or activities, the order issued shall include the following statement: VIOLATION OF THIS ORDER IS A CRIME PUNISHABLE UNDER SECTION 422.77 OF THE PENAL CODE.

(f) The court shall order the plaintiff or the attorney for the plaintiff to deliver, or the clerk of the court to mail, two copies of any order, extension, modification, or termination thereof granted pursuant to this section, by the close of the business day on which the order, extension, modification, or termination was granted, to each local law enforcement agency having jurisdiction over the residence of the plaintiff and any other locations where the court determines that acts of violence against the plaintiff

70

are likely to occur. Those local law enforcement agencies shall be designated by the plaintiff or the attorney for the plaintiff. Each appropriate law enforcement agency receiving any order, extension, or modification of any order issued pursuant to this section shall serve forthwith one copy thereof upon the defendant. Each appropriate law enforcement agency shall provide to any law enforcement officer responding to the scene of reported violence, information as to the existence of, terms, and current status of, any order issued pursuant to this section.

(g) A court shall not have jurisdiction to issue an order or injunction under this section, if that order or injunction would be prohibited under Section 527.3 of the Code of Civil Procedure.

(h) An action brought pursuant to this section is independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law, including, but not limited to, an action, remedy, or procedure brought pursuant to Section 51.7.

(i) In addition to any damages, injunction, or other equitable relief awarded in an action brought pursuant to subdivision (c), the court may award the petitioner or plaintiff reasonable attorney's fees.

(j) A violation of an order described in subdivision (e) may be punished either by prosecution under Section 422.77 of the Penal Code, or by a proceeding for contempt brought pursuant to Title 5 (commencing with Section 1209) of Part 3 of the Code of Civil Procedure. However, in any proceeding pursuant to the Code of Civil Procedure, if it is determined that the person proceeded against is guilty of the contempt charged, in addition to any other relief, a fine may be imposed not exceeding one thousand dollars ($1,000), or the person may be ordered imprisoned in a county jail not exceeding six months, or the court may order both the imprisonment and fine.

(k) Speech alone is not sufficient to support an action brought pursuant to subdivision (b) or (c), except upon a showing that the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence had the apparent ability to carry out the threat.

(*l*) No order issued in any proceeding brought pursuant to subdivision (b) or (c) shall restrict the content of any person's speech. An order restricting the time, place, or manner of any person's speech shall do so only to the extent reasonably necessary to protect the peaceable exercise or enjoyment of constitutional or statutory rights, consistent with the constitutional rights of the person sought to be enjoined.

(m) The rights, penalties, remedies, forums, and procedures of this section shall not be waived by contract except as provided in Section 51.7.

(n) The state immunity provisions provided in Sections 821.6, 844.6, and 845.6 of the Government Code shall not apply to any cause of action brought against any peace officer or custodial officer, as those terms are defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, or directly against a public entity that employs a peace officer or custodial officer, under this section.

72

73

(*o*) Sections 825, 825.2, 825.4, and 825.6 of the Government Code, providing for indemnification of an employee or former employee of a public entity, shall apply to any cause of action brought under this section against an employee or former employee of a public entity.

**Credits**

(Added by Stats.1987, c. 1277, § 3. Amended by Stats.1990, c. 392 (A.B.2683), § 1; Stats.1991, c. 607 (S.B.98), § 3; Stats.2000, c. 98 (A.B.2719), § 3; Stats.2001, c. 261 (A.B.587), § 2; Stats.2002, c. 784 (S.B.1316), § 11; Stats.2004, c. 700 (S.B.1234), § 1; Stats.2014, c. 296 (A.B.2634), § 1, eff. Jan. 1, 2015; Stats.2014, c. 910 (A.B.2617), § 4.5, eff. Jan. 1, 2015; Stats.2018, c. 776 (A.B.3250), § 4, eff. Jan. 1, 2019; Stats.2021, c. 401 (A.B.1578), § 1, eff. Jan. 1, 2022; Stats.2021, c. 409 (S.B.2), § 3, eff. Jan. 1, 2022.)

West's Ann. Cal. Civ. Code § 52.1, CA CIVIL § 52.1

Current with urgency legislation through Ch. 474 of 2025 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.